

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

NR:MCM/EDP
F. #2015R01573

*271 Cadman Plaza East, 6th Floor*
*Brooklyn, New York 11201*

October 23, 2019

The Honorable Nicholas G. Garaufis
United States District Court
Eastern District Of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:    United States v. Elozer Porges
               <u>Docket Number 17-CR-431 (NGG)</u>

Dear Judge Garaufis:

On March 30, 2018, the defendant Elozer Porges ("the defendant" or "Porges") appeared before Your Honor and pled guilty, pursuant to a plea agreement, to one count of conspiracy to commit mail and wire fraud, in violation of 18 U.S.C. § 1349. For the reasons outlined below, the government respectfully requests that this Court impose a sentence within the applicable United States Sentencing Guidelines (the "Guidelines") range of 41-51 months' imprisonment.

I.     <u>Background</u>

Starting in approximately 2006, the defendant Porges served as the Executive Director of the Central United Talmudic Academy ("CUTA"), a religious school system in Williamsburg, Brooklyn. (Pre-Sentence Investigation Report ("PSR") ¶ 69.) During the time period relevant to this prosecution, CUTA's schools were attended by several thousand children belonging to the Satmar Hasidic community.

In October 2013, Porges submitted an application to the New York State Department of Health ("NYSDOH") on behalf of CUTA seeking CUTA's admission into the Child and Adult Care Food Program ("CACFP"). (Id. at ¶ 13.) Among other things, the CACFP empowers local government authorities, such as the NYSDOH, to provide funding for meals to needy and underserved populations. (Id. at ¶¶ 11-12.) In CUTA's application, Porges represented that CUTA would provide "at-risk suppers" prepared at the school to children at all three of its locations: an all-boys school located at 762 Wythe Avenue, and two all-girls schools located at 25 Franklin Street and 84-88 Sandford Street. (Id. at ¶ 13.)

        In or around December 2013, Porges and his assistant, co-defendant Joel Lowy, met with a NYSDOH nutritionist. (Id. at ¶ 15.) During the conversation with the nutritionist, Porges affirmed that he would arrange to have accurate counts of the meals served to the schools' children, and that accurate meal claims would be generated from those counts. (Id.) On December 31, 2013, the NYSDOH approved CUTA to serve CACFP-subsidized meals. (Id. at ¶ 16.) CUTA and NYSDOH then entered into an agreement under which CUTA agreed to only claim reimbursement for meals actually served, and maintain accurate records supporting the claims for reimbursement, among other requirements. (Id.) Porges and Lowy were nominated to submit claims of reimbursement on behalf of CUTA. (Id. at ¶ 17.)

        Throughout 2014 and 2015, Porges and Lowy submitted meal counts to the NYSDOH in order to seek financial reimbursement for CUTA. (Id. at ¶ 18.) These meal counts, which were submitted both by mail and by electronic web portal, were nearly entirely fictitious,[1] and the dinner programs contemplated by the CACFP program never existed. (Id. at ¶¶ 18-20.) In total, CUTA received approximately $3,256,338.68 in funds for purported meals that it, in fact, never prepared or served to the school children. (Id. at ¶ 23.)

II.    Guidelines Calculation

        In the PSR, the Probation Department has provided the following estimate of the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") calculation applicable to the defendant:

| | |
|---|---:|
| Base Offense Level (§2B1.1(a)(1)) | 7 |
| Loss greater than $1,500,000 (§2B1.1(b)(1)(I)) | +16 |
| Defendant was an organizer, leader, manager or supervisor in the criminal activity (§3B1.1) | +2 |
| Abuse of position of trust (§3B1.3) | +2 |
| Acceptance of Responsibility (§3E1.3) | -3 |
| Total | 24 |

---

[1] Although a very small number of snacks and small meals appear to have been served at the schools, the evidence indicated that those meals—which would not have met the CACFP requirements—predated the commencement of the CACFP program.

According to the PSR, assuming the defendant falls within Criminal History Category I, the applicable Guidelines range is 51-63 months' imprisonment.  Notably, the government did not include an adjustment for abuse of a position of trust within the defendant's plea agreement as included in the PSR.[2]  The Guidelines permit a two-level enhancement if a defendant "abused a position of public or private trust, or used a special skill, in a manner that facilitated the commission or concealment of the offense."  U.S.S.G § 3B1.3.  Although the Probation Department applied this enhancement based on a finding that Porges's and Lowy's use of the NYSDOH computer portal to submit false claim forms constituted "use of a special skill" (PSR ¶¶ 17, 36), the government submits that application of this enhancement based on the "abuse of a public trust" may be more appropriate in this case.  A court must undertake a two-prong analysis to find that the "position of trust" enhancement is warranted:

> First, the court must determine that the defendant occupied a position of trust.  [United States v. Nuzzo, 385 F.3d 109, 115 (2d Cir. 2004)]  Whether the defendant occupied a position of trust must be viewed from the perspective of the victim.  See United States v. Thorn, 317 F.3d 107, 120 (2d Cir. 2003).  The primary inquiry to determine whether a person is in a position of trust is "'the extent to which the position provides the freedom to commit a difficult-to-detect wrong.'"  See United States v. Allen, 201 F.3d 163, 166 (2d Cir. 2000) (quoting United States v. Viola, 35 F.3d 37, 45 (2d Cir. 1994)).  The Second Circuit has repeatedly emphasized that "this standard requires that the 'defendant's position must involve discretionary authority . . . [and that] this discretion must have been entrusted to the defendant by the victim."  United States v. Thorn, 317 F.3d 107, 120 (2d Cir. 2003) (quoting United States v. Hirsch, 239 F.3d 221, 227 (2d Cir. 2001)).  Second, the court must find that the defendant violated that trust in a way that significantly contributed to the crime at issue.  Nuzzo, 385 F.3d at 115.

United States v. Adams, No. 03-CR-1368 (ARR), 2006 WL 229904, at *6 (E.D.N.Y. Jan. 31,

---

[2] The government's plea agreement expressly indicated that the range included in the agreement was merely an estimate and that "[i]f the Guidelines offense level advocated by the Office, or determined by the Probation Department or the Court, is, for any reason, including an error in the estimate, different from the estimate, the defendant will not be entitled to withdraw the plea and the government will not be deemed to have breached this agreement."  (See, e.g., Plea Agr. ¶ 3).

2006).  For the reasons elaborated upon in section IV.D of this letter, the defendant's crime depended in no small part on the trust extended by the NYSDOH to CUTA to self-certify the number of meals it allegedly served to children, and Porges's concomitant reliance that CUTA's representations would be accepted as true.  However, given the facts known to the government at this time, the government will not move for the Court to apply an enhancement pursuant to U.S.S.G § 3B1.3.  If the Court finds that the enhancement for abuse of trust is not warranted, the defendant's adjusted offense level is 22, corresponding to a Guidelines range of 41-51 months, assuming that the defendant falls in Criminal History Category I.

     III.    Legal Standard

       In the Supreme Court's opinion in United States v. Booker, 125 S. Ct. 738, 743 (2005), which held that the Guidelines are advisory not mandatory, the Court made clear that district courts are still "require[d] . . . to consider Guidelines ranges" in determining sentence, but also may tailor the sentence in light of other statutory concerns.  See 18 U.S.C. § 3553(a).  Subsequent to Booker, the Second Circuit held that "sentencing judges remain under a duty with respect to the Guidelines . . . to 'consider' them, along with the other factors listed in section 3553(a)."  United States v. Crosby, 397 F.3d 103, 111 (2d Cir. 2005).

       In Gall v. United States, 128 S. Ct. 586 (2007), the Supreme Court elucidated the proper procedure and order of consideration for sentencing courts to follow: "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range.  As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark."  Gall, 128 S. Ct. at 596 (citation omitted).  Next, a sentencing court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party.  In so doing, he may not presume that the Guidelines range is reasonable.  He must make an individualized assessment based on the facts presented."  Id. at 596-97 (citation and footnote omitted).

     IV.    Argument

       A.    The Fraudulent Conduct

       Between approximately October 2013 and March 2016, Elozer Porges and his co-conspirators engaged in a brazen fraud.  In his position as executive director of CUTA, Porges represented to New York State that his school system was serving thousands of meals a day to needy, at-risk children.  This was a lie:  there was no meal program.  Instead, Porges and his co-conspirators created false paperwork and sent fraudulent meal counts to the state agency tasked with feeding hungry children.  Through these lies, Porges obtained more than $3 million in reimbursement—all for a meal program that never actually existed.

During the pendency of this fraud, Porges served as executive director of CUTA.  He signed the CACFP application as the "authorized representative" of CUTA.  He was charged under the agreement with NYSDOH with faithfully accounting for CUTA's expenditures under the program.  For nearly two years, Porges and his assistant lied month after month as they submitted fraudulent meal counts for the fictitious program.

In his sentencing memorandum, Porges seeks a non-incarceratory sentence, minimizing both the harm of the crime committed as well as his own individual culpability.  These arguments should be rejected.

As an initial matter, Porges attempts to minimize the gravity of the crime itself.  He states, for example, that the stolen "funds . . . were only used for the operation of the school," and that the fraud was "well-intentioned" because it aimed to "build a school."  This is disingenuous and contrary to the evidence.  During its investigation into this multi-year fraud, the government performed a detailed forensic analysis of the manner in which CUTA spent the funds it obtained from the CACFP program.  This review revealed that the funds were not reallocated towards other school essentials such as teachers' salaries, books or other supplies needed to educate children.  Instead, the stolen money was largely spent on evening events attended by adults, which took place at the 762 Wythe Street location in a room designed for such events.

A review of the account that received the $3.2 million in funds from the CACFP made expenditures that were clearly not part of any school-related meal program.  For example, included in the expenditures, among other things, was over $800,000 paid to a poultry butcher.  The government interviewed dozens of individuals with personal knowledge of CUTA's day-to-day inner-workings, including its kitchens.  Interviews of these individuals revealed that chicken was never served to children during CUTA's respective breakfast, lunch and snack programs.  Indeed, these interviews revealed that because of certain religious requirements regarding the preparation and service of certain types of food items in the same location, food workers were prohibited from preparing chicken in the kitchen where meals for the three schools were prepared.  These interviews further revealed that the school hosted events for adults nearly every evening—often several events at a time—and that chicken, prepared in a different kitchen at 762 Wythe Street, was always served at these gatherings.  Many of the other purchases using the CACFP funds were generally consistent with the meals served during these evening adult events. Such expenditures were not "well-intentioned" efforts to "build a school"; they were Porges stealing funds set aside for needy children to defray the costs of community dinner parties.

Porges further writes that "neither he nor anyone at the school received any personal benefit" from these crimes.  As discussed above, the funds were used to benefit the community as a whole, with CUTA's buildings being used as a hub of activity.  As such, the students did not receive the benefit of the funds as intended; rather, Porges syphoned off the

fraudulently obtained funds, using them as a communal piggybank. Not only was this an impermissible use of the funds, but Porges' repeated lies over the course of several years regarding how the funds were being used showed a complete disregard for the fact that CUTA's misuse of these funds literally stole food out of needy children's mouths. If CUTA did not require government assistance to provide meals for needy children in their community, these funds could have been used to better fund other school meal programs in other locations.

Further, Porges characterization of what constitutes a "personal benefit" mischaracterizes the manner in which CUTA, and the community at large, was funded. The investigation has indicated that CUTA owes its financial support to three primary sources: nominal student tuition, contributions from the surrounding community and government funding, with government funding providing the majority of its revenue. Every dollar obtained through government sources is a dollar that does not need to be paid in tuition or contributed to the schools by the wealthy community members. The theft that Porges engineered must be viewed in this light—this is the very "personal benefit" that Porges denies he or others received as a result of the scheme. While Porges may not have personally contributed funds used to operate the school, other members of the community did and were expected to do so. Each of these individuals stood to benefit when $3.2 million in fraudulent funds made collection of community contributions unnecessary.

Along these same lines, Porges states that he would "never think of taking money designated for children for personal use." Here, again, Porges seeks to define his theft in a manner that minimizes his culpability and the actual effect of his conduct. The government does not assert that Porges committed this crime to buy himself a car or some other luxury item. The benefit to Porges and others is more nuanced. Porges was the executive director of CUTA, and the highest paid employee of the organization, making more than $150,000 a year. (PSR at ¶ 69.)[3] He was paid by the school to, among other things, make sure that it could provide its services while asking as little as possible from its financial backers and its student families. The evidence shows that he accomplished this by fraud: he invented a fake dinner program for needy children, applied to the government for the funds to run that program, and diverted those funds to unrelated expenses. It is unclear whether Porges received a specific bonus for this perfidy; but, Porges was the director of CUTA, he orchestrated these brazen acts of fraud, and he was paid very well for it.

---

[3] Payroll records from 2014 state that Porges's salary was $165,000.

B.    Community Support

Porges's sentencing memorandum is accompanied by a number of letters of
support from members of his community.  Although the sentiments expressed by Porges's
associates can certainly factor into the Court's decision, support of this nature is not
uncommon for defendants of Porges's stature.  It is not unusual for fraud cases to feature
individuals of influence who have used their resources and authority to do good, however
this should not hold significant weight in fashioning an appropriate sentence.  See, e.g.,
United States v. Barbera, No. 02-CR-1268, 2005 WL 2709112, at *13 (S.D.N.Y. Oct. 21,
2005) (noting that "the high regard in which [the defendant] is evidently held by the
colleagues and friends who have written letters on his behalf does not distinguish him from
other white-collar criminals in any manner that would merit a downward departure").

Moreover, the government submits that the Court should view these
sentiments through the lens of the conduct of conviction.  Porges used his position to steal in
a manner that benefited his community at large.  Although he claims that he has "fallen from
a position of respect and admiration," the support offered to him in these letters belies that
assertion.  He committed fraud to defray costs his community would otherwise have had to
bear.  He committed fraud to spare his school's financial backers from having to pay their
full shares to operate the school.  And he has taken the full responsibility for these acts upon
his shoulders.  The government submits that these circumstances cannot be ignored as the
Court evaluates the sentiments expressed in the letters of support.

C.    Family Circumstances

Porges asks that the Court issue a non-incarceratory sentence for the sake of
his family, particularly given his large number of children.  The government submits that this
should hold little, if any, weight in the Court's determination of sentence.  As an initial
matter, the Guidelines counsel that "family ties and responsibilities are not ordinarily
relevant in determining whether a departure is warranted."  U.S.S.G. § 5H1.6.  "Family ties
and responsibilities are a discouraged basis for departure.  This is because 'many defendants
shoulder responsibilities to their families [and] disruption of the defendant's life, and the
concomitant difficulties for those who depend on the defendant, are inherent in the
punishment of incarceration.'"  United States v. Sprei, 145 F.3d 528, 534 (2d Cir. 1998)
(citation omitted) (quoting United States v. Johnson, 964 F.2d 124, 128 (2d Cir. 1992)).  In
addition to the general disfavor with which such factors are considered, the government
submits that as a practical matter, Porges' family situation does not warrant any special
consideration.

First, Porges and his wife had given birth to at least ten of his eleven children
before the crime in question took place.  In October 2013, when Porges first began
submitting the first fraudulent documents in what would become a multi-million dollar

crime, Porges was making a six-figure salary and had already fathered numerous children. The crime here was not an act of desperation—this was a calculated act by someone who might be expected to provide for his family.  The defendant was aware of the potential consequences that typically flow from committing a crime, and he nevertheless flouted the law, putting himself at risk of incarceration.  In so doing, the defendant gave little consideration to the effect such conduct would have on his family.  The defendant's suggestion that the Court not impose an incarceratory sentence—notwithstanding the seriousness of his crime—because he has a family rings hollow.  This Court should not allow the defendant to use his children as a shield to avoid punishment now that the defendant's crimes have come to light

Second, by any measurement, the defendant's religious community appears to be tightly knit and supportive of its members.  Porges himself casts his crime as an act for the school, not for himself.  The abundant letters in this case support the notion that Porges belongs to the kind of community that aids neighbors, particularly when they are in distress. This Court has no doubt faced dozens of defendants who lacked such community structure, and whose families would be isolated if the defendant's parent were imprisoned.  As demonstrated by the many letters of support, this is not such a situation.

Third, and perhaps most significantly, the evidence suggests that the defendant's wife has had the means to adequately care for their family on her own when necessary for long periods of time.  As part of the government's larger investigation, the government has obtained and reviewed food stamp and other benefit applications submitted by the defendant's wife to the City of New York (see Attachment A, provided separately by email to defense counsel and court).  In these submissions, the defendant's wife represented that she was separated from him for a number of years, that she was the primary caregiver of her children, and that the defendant—despite his significant six-figure salary—offered very limited financial support.  These documents included the following information:

- In a January 19, 2011 food stamps application, the defendant's wife described herself as separated and listed all her children as her dependents.  She did not detail any outside support received from the defendant.

- In a February 29, 2011 letter, the defendant stated that his wife was living at a specific address and the defendant was paying her $150 per month in child support.

- In a March 9, 2012 food stamps recertification, the defendant's wife described herself as separated, listed all her children as her dependents, and noted $150 a week in support.

- In a March 15, 2012 letter, the defendant stated that he provided $150 a week to his wife.

- In an April 9, 2012 "Certificate of Amendment and Clarification of the Separation Agreement," dated April 23, 2012, the defendant and his wife agreed that the defendant would pay $600 a month in support, but that his financial support would drop to $25 a month if and when the defendant obtained a job that pays at least $600 a month.

- In an April 17, 2013 food stamps recertification, the defendant's wife described herself as separated, listed all her children as her dependents and listed $25 a month in child support.

- In an undated Periodic Report covering the month of September 2013, the defendant's wife stated that she made $290 in salary bi-weekly. She did not detail any outside support received from the defendant.

- In a March 1, 2014 food stamps recertification, the defendant's wife described herself as single (not separated), listed all her children as her dependents, and noted that she was receiving $25 a month in child support.

These sworn documents, spanning more than three years, demonstrate the defendant's wife's ability to manage and provide for her family, even in the defendant's absence—a key consideration under the law. United States v. Huerta, 371 F.3d 88, 95 (2d Cir. 2004) (noting that "the absence or presence of adults who can step in during the defendant's incarceration to assist with caring and providing for the defendant's dependents—is a central part of the extraordinary family circumstances inquiry").

D.     General Deterrence

Both the defendant and the Aleph Institute[4] ask this court to issue a sentence of community service rather than incarceration.  This recommendation abjectly fails to address the nature and severity of the conduct at issue.  The facts of this case are plain.  The defendant told the government that he needed assistance to feed thousands of needy children each day.  He convinced the government that he would run such a program honestly and he earned certification as a program administrator.  What then did he do?  He stole and he deceived.  Month after month, the defendant and his co-defendant submitted false meal counts to ensure that the government would keep the piggybank open.  This was not aberrational conduct—it happened month after month for years, permitting CUTA to receive more than $3 million in ill-gotten gains.

Beyond the brazen nature of the defendant's criminal conduct, this Court must also consider the issue of general deterrence.  The CACFP, like many government meal programs, depends upon the integrity of its participants.  At the time of the defendant's crimes, the NYSDOH had CACFP agreements with more than 1,400 organizations, which in turn provided meals at approximately 14,000 feeding locations.  The types of organizations that participated in the CACPF program were not unlike CUTA in many respects.  Most of the organizations receiving funds were schools, religious groups and community organizations, all of which the public would likely trust to properly allocate government funds.  The CACFP program depends in large part on its participants accurately reporting the number of children that it must feed each day.  The recipients are not required to file invoices for their purchases or itemize their expenses.  Instead, the system relies upon the participants properly administering the programs.  A significant incarceratory sentence will send a clear message and deter those who, like the defendant, would otherwise seek to take advantage of a system that fills an important need of feeding needy children in our communities.

---

[4] The government submits that the Court should give little weight to the submission offered by the Aleph Institute.  For the reasons outlined in this letter, the government finds that their sentencing recommendation fails to appropriately address the severity of the crime committed by the defendant.  More generally, however, the government has reviewed the submissions by the Aleph Institute in a number of local cases, both in this district and the Southern District of New York, and found that their recommendations consistently lack the tailoring required by analysis of the 3553(a) factors.  To the contrary, in the cases reviewed by the undersigned, the Aleph Institute consistently recommends a non-incarceratory sentence, even in response to conduct as severe as that proven in the corruption prosecution of former assemblyman Sheldon Silver.  15-CR-93, Dkt. 439-6 (S.D.N.Y.) (proposing "a lengthy period of probation" in lieu of incarceration).

11

V.     <u>Conclusion</u>

        For all of these reasons, the government asks that the Court impose an incarceratory sentence within the applicable guidelines range of 41-51 months' imprisonment.

Respectfully submitted,

RICHARD P. DONOGHUE
United States Attorney

By:        <u>     /s/               </u>
            Maria Cruz Melendez
            Erik D. Paulsen
            Assistant U.S. Attorneys
            (718) 254-6208/6135

cc:    Henry Mazurek, Esq. (via email)
       Evan Lipton, Esq. (via email)